STANDARD HOME CO. v. DAVIS, State Bank Com'r, et al.

(District Court, E. D. Arkansas, W. D. October 15, 1914.)

No. 1819.

1. CONSTITUTIONAL LAW (§ 42*)—DETERMINATION OF VALIDITY OF STATUTES.
	A statute will not be declared unconstitutional at the instance of one not affected by it.
	[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 39, 40; Dec. Dig. § 42.*]

2. COMMERCE (§ 16*)—TRANSACTIONS CONSTITUTING INTERSTATE COMMERCE—INVESTMENT COMPANIES—"INTERSTATE COMMERCE."
	An investment company, which sells contracts requiring the purchaser to make monthly payments, which are invested by the company and, after a certain number of successive payments have been made, returned, with the profits earned, not exceeding a specified sum, and which also makes loans to its contract holders for the purchase of homes, taking mortgages on the property purchased, is not engaged in commerce, within the meaning of the commerce clause of the Constitution (article 1, § 8) ; and the fact that its business is interstate does not render a state statute regulating its operations within the state unconstitutional as in violation of such clause.
	[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 2; Dec. Dig. § 16.* ,
	For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3.** SEARCHES AND SEIZURES (§ 7*)—WITNESSES (§ 300*)—PRIVILEGES AND IMMUNITIES—UNREASONABLE SEARCH.

A state law authorizing an inquiry into the condition of corporations doing business in the state, and requiring them to submit to an examination in respect thereto, is not unconstitutional, as in violation of the provisions of the fourth or fifth amendments, protecting persons from unreasonable searches and from being compelled to be witnesses against themselves in any criminal case.

[Ed. Note.—For other cases, see Searches and Seizures, Cent. Dig. § 5; Dec. Dig. § 7;* Witnesses, Cent. Dig. §§ 1042, 1042½; Dec. Dig. § 300.*]

**4.** CORPORATIONS (§ 636*)—FOREIGN CORPORATIONS—POWER OF STATE TO REGULATE.

When a foreign corporation accepts a license to do business in the state of Arkansas, which by article 12, §§ 6, 11, of its Constitution, provides that the charters of corporations may be altered or annulled by the Legislature, and that foreign corporations doing business in the state shall have no greater powers, privileges, or franchises than domestic corporations, such provisions become a part of the contract between the corporation and the state, which may make any laws affecting the business of the corporation that may be deemed proper, provided they do not amount to a confiscation of property or an impairment of the obligation of contracts.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2505–2509, 2571; Dec. Dig. § 636.*]

**5.** CORPORATIONS (§ 636*)—REGULATION BY STATE—ARKANSAS STATUTE.

Act Ark. March 28, 1913 (Laws 1913, p. 904), providing for the regulation of investment companies, *held* not in violation of the federal or state Constitutions, in so far as it affected the rights of a foreign company, nor void because of the unreasonableness of its requirements, or on the ground it is not within the police power of the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2505–2509, 2571; Dec. Dig. § 636.*]

**6.** CONSTITUTIONAL LAW (§ 276*)—PERSONAL RIGHTS—LIBERTY TO CONTRACT.

While freedom of contract is a right inherent in every person under the Constitution of the United States, it is not an absolute, but a qualified, right, free from arbitrary restraint, but subject to reasonable regulation.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 845, 846; Dec. Dig. § 276.*]

**7.** CONSTITUTIONAL LAW (§ 70*)—DETERMINATION OF VALIDITY OF STATUTES—JUDICIAL AUTHORITY.

The courts cannot review the economics or facts on which the Legislature bases its conclusions that an existing evil should be remedied by an exercise of the police power.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129–132, 137; Dec. Dig. § 70.*]

In Equity. Suit by the Standard Home Company against John M. Davis, Bank Commissioner of the State of Arkansas, and others. On motion to dismiss. Motion sustained.

The plaintiff seeks to enjoin the enforcement of what is known as the "blue sky law" of the state of Arkansas, enacted by the General Assembly of 1913, upon the ground of its unconstitutionality. The defendants filed a motion to dismiss for failure to state a cause of action, the plaintiff not asking for a temporary injunction. In order that the issues involved may be fully understood, a copy of the act, as approved March 28, 1913, is here set forth:

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"An act to provide for the regulation and supervision of investment companies and to provide a penalty for the violation thereof.

"Be it enacted by the general assembly of the state of Arkansas:

"Section 1. Every individual, corporation, co-partnership or company, and every association (other than national banks and corporations not organized for profit) now, or which shall hereafter be organized in this state, whether incorporated or unincorporated, which shall sell or negotiate for the sale of any stock, contracts, bonds or other securities of any kind or character other than bonds of the United States, or of some municipality authorized to issue bonds of the state of Arkansas, and notes secured by mortgages on real estate located in the state of Arkansas, or sell building stock or loan investments, or building investments to any person or persons in the state of Arkansas, other than those specifically exempted herein, shall be known for the purpose of this act as a domestic investment company. Every such investment company organized in any other state, territory or government, organized under the laws of any other state, territory or government, shall be known for the purpose of this act as a foreign investment company.

"Section 2. Before offering or attempting to sell any stock, contracts, bonds or other securities, building contracts, loan investments or other securities of any kind or character other than those specifically exempted in section 1 of this act to any person or persons, or transacting any business whatever in this state, except that of preparing the documents hereinafter required, every such investment company, domestic or foreign, now or hereafter doing business in this state shall file in the office of the insurance commissioner of this state, together with a filing fee of five dollars ($5.00), in addition to the fees now required of all corporations, the following document to wit:

"A statement showing in full detail the plan upon which it proposes to transact business. A copy of all contracts, bonds or other instruments which it proposes to make with or sell to its contributors. A statement which shall show the name and location of the investment company, and an itemized account of its actual financial condition and the amount of its property and liabilities, and such other information touching its affairs as said insurance commissioner may require. If such investment company shall be a copartnership or unincorporated association it shall also file with the insurance commissioner a copy of its articles of copartnership or association, and all other papers pertaining to its organization, and if it be a corporation organized under the laws of Arkansas it shall also file with the insurance commissioner a copy of its. articles of incorporation, constitution and by-laws, and all other papers pertaining to its organization. If it shall be an investment company organized under the laws of any other state, territory or government, incorporated or unincorporated, it shall also file with said insurance commissioner a copy of the laws of such state, territory or government under which it exists or is incorporated, and also a copy of its charter, articles of incorporation, constitution and by-laws and all amendments thereof which have been made and all other papers pertaining to its organization.

"Section 3. The duties devolving upon the insurance commissioner under this act shall automatically pass to and become a part of the duties of the bank commissioner whenever that office shall be created in this state, and the fees provided for herein for the services of the insurance commissioner and his assistants shall also pass to the bank commissioner and his assistants to pay them for the time required in the performance of the duties set out in this act. Provided in no event shall this act be construed so as to increase the salary of the bank commissioner beyond that fixed by the act creating his office, nor shall this act increase the salary of the insurance commissioner, but in order to carry out the provisions of the act an assistant or deputy may be appointed at a salary of $1,800 a year, to be paid monthly in accordance with section 15 of this act, and said sum is hereby appropriated out of the fund mentioned in section 15 for said salary.

"Section 4. All of the above described papers shall be verified by oath, of a member of a copartnership or company, if it be a copartnership or company, or by the oath of a duly authorized officer, if it be an incorporated or unincorporated association. All such papers however, as are recorded or are on

file in any public office shall be further certified to by the officer of whose records or archives they form a part, as being correct copies of such records or archives. The verification described in this section shall be made in the office of the insurance commissioner or bank commissioner as the case may be, and it will not be sufficient for the same to be made in the state where the company is domiciled and then mailed to the commissioner but where the individual, corporation, copartnership or company or association is a nonresident of this state, then the verification and filing must take place as described in this proviso. Provided further, that the verification and filing of papers as provided in this act may be mailed or otherwise sent to the commissioner where the individual, corporation, copartnership or company or association is a resident of the state.

"Section 5. Every foreign investment company shall also file its written consent, irrevocable that actions may be commenced against it, in the proper court of any county in this state in which a cause of action may arise, or in which the plaintiff may reside, by the service of process on the secretary of state, and stipulating and agreeing that such service of process on the secretary of state shall be taken and held, in all courts, to be as valid and binding as if due service had been made on the company itself, according to the laws of this state or any other state, and such instrument shall be authenticated by the seal of said foreign investment company and by the signature of a member of the copartnership or company, if it be a copartnership or company, or by the signatures of the president and secretary of the incorporated or unincorporated association, if it be an incorporated or unincorporated association, and shall be accompanied by a duly certified copy of the order or resolution of the board of directors, trustees or managers of the corporation authorizing the said secretary and president to execute the same. Whenever service of process is served on the secretary of state, he shall within twenty-four hours thereafter mail the same to the home of the company against whom the process is directed. The secretary of state is hereby commanded to register said summons and if within a reasonable time he does not receive a return card showing the same has been delivered, he shall register another letter to said company.

"Section 6. It shall be the duty of the insurance commissioner to examine the statements and documents so filed, and if said insurance commissioner shall deem it advisable he shall make or have made a detailed examination of such investment company's affairs, which examination shall be at the expense of such investment company, as hereinafter provided; and if he find that such investment company is solvent, that its articles of incorporation or association, its constitution and by-laws, its proposed plan of business and proposed contract contain and provide for a fair, just and equitable plan for the transaction of business, and in his judgment promises a fair return on the stocks, bonds and other securities by it offered for sale, the insurance commissioner shall issue to such investment company a statement reciting that such company has complied with the provisions of this act, that detailed information in regard to the company and its securities is on file in the insurance commissioner's office for public inspection and information, that such investment company is permitted to do business in this state, and such statement shall also recite in bold type that the insurance commissioner in no wise recommends the securities to be offered for sale by such security company. But if said insurance commissioner finds that such articles of incorporation or association charter, constitution and by-laws, plan of business or proposed contract contain any provision that is unfair, unjust, inequitable or oppressive to any class of contributors, or if he decides from his examination of its affairs that said investment company is not solvent and does not intend to do a fair and honest business, and in his judgment does not promise a fair return on the stocks, bonds, or other securities by it offered for sale, then he shall notify such investment company in writing of his findings, and it shall be unlawful for such company to do any further business in this state until it shall so change its constitution and by-laws, articles of incorporation or association, its proposed plan of business and proposed contract and its general financial condition in such manner as to satisfy the insurance commissioner that

it is solvent, and its articles of incorporation or association, its constitution and by-laws, its proposed plan of business and proposed contract provide for a fair, just and equitable plan for the transaction of business and dues, in his judgment promise a fair return on the stocks, bonds and other securities by it offered for sale; provided, that all expenses paid or incurred and all fees or charges received or collected for any examination made under the provisions of this section of this act be reported in detail by the insurance commissioners and a full report and record thereof made in detail. After any such domestic or foreign investment company is admitted under the terms of this act its license may be revoked by said insurance commissioner if he finds that said company is attempting in any manner to defraud the public. Whenever a right of any investment company to do business in this state is refused or revoked as set out in this section, said company may within 20 days after notification institute a suit in the chancery court in any county in this state where its principal office is maintained or its principal agent resides, asking that said refusal or revocation be annulled. The insurance commissioner or his deputy shall defend said suit upon notice that the same is pending and the Attorney General or his assistant shall represent him. If it be determined that the refusal or revocation was wrongful the company shall be reinstated and the cost shall be paid in the same manner and out of the same fund as the cost for maintaining this department. If it be ascertained that the refusal or revocation be justified, the cost shall be paid by the company. The company shall not be permitted to do any business after notice of refusal or revocation until it be determined by the chancery court that the refusal or revocation was wrongful, provided, such company may be allowed to continue in business in the discretion of the chancery court under such regulations as said court may prescribe.

"Section 7. It shall not be lawful for any investment company either as principal or agent, to transact any business, in form or character similar to that set forth in section 1 of this act, except as is provided in section 2 of this act, until it shall have filed the papers and documents above provided for. No amendment of the charter, articles of incorporation, constitution and by-laws of any such investment company shall become operative until a copy of the same has been filed with the insurance commissioner as provided in regard to the original filing of charter, articles of incorporation, constitution and by-laws, nor shall it be lawful for any such investment company to transact business on any other plan than that set forth in the statement required to be filed by or to make any contract other than that shown in the copy of the proposed contract required to be filed by section 2 of this act, until a written statement showing in full detail the proposed new plan of transacting business and a copy of the proposed new contract shall have been filed with the insurance commissioner, in like manner as provided in regard to the original plan of business and proposed contract, and the consent of the insurance commissioner obtained as to making such proposed new plans of transacting business and proposed new contract.

"Section 8. Any investment company may appoint one or more agents, but no such agent shall do any business for said investment company in this state until he shall first register with the insurance commissioner as agent for such investment company, and for each of such registrations there shall be paid to the insurance commissioner the sum of two dollars ($2.00). Such registration shall entitle such agent to represent said investment company as its agent until the first day of March following, unless said authority is sooner revoked by the insurance commissioner; and such authority shall be subject to revocation at any time by the insurance commissioner for cause appearing to him sufficient.

"Section 9. Every investment company, domestic or foreign, shall file at the close of business on December 31st and June 30th of each year, and at such other times as is required by the insurance commissioner, a statement verified by the oath of the copartnership or company if it be a copartnership or company, or by the oath of a duly authorized officer, if it be an incorporated or an unincorporated association, setting forth in such form as may be prescribed by the said insurance commissioner, its financial condition and

the amount of its assets and liabilities, and furnishing such other information concerning its affairs as said insurance commissioner may require. Each regular statement of December 31st and June 30th shall be accompanied by a filing fee of two dollars and fifty cents. Any investment company failing to file its report at the close of business December 31st or June 30th of each year within ten days of that date, or failing to file any other or special report herein required within thirty days after receipt of request or requisition therefor, shall forfeit its right to do business in this state.

"Section 10. The general accounts of every investment company, domestic or foreign, doing business in this state, shall be kept by double entry, and such company, its copartners or managing officers, shall at least once in each month make a trial balance of such accounts, which shall be recorded in a book provided for that purpose; such trial balances and all other books and accounts of such company shall at all times during business hours, except on Sundays and legal holidays, be open to the inspection of the insurance or bank commissioner and his deputies.

"Section 11. The insurance or bank commissioner shall have general supervision and control, as provided by this act, over any and all investment companies, domestic or foreign now or hereafter doing business in this state, and all such investment companies shall be subject to examination by the insurance or bank commissioner or his duly authorized deputy at any time the insurance or bank commissioner may deem advisable and in the same manner as is now or may hereafter be provided for the examination of insurance companies. The rights, powers, and privileges of the commissioner shall be the same as is now or may hereafter be provided with reference to examination of insurance companies. If such examination resulted in a revocation of the examined company's right to do business in this state or a change in its method of doing business and this finding if appealed from is sustained, such company shall pay a fee for such examination of not to exceed five dollars ($5.00) for each day or fraction plus the actual travel and hotel expenses of the person making the examination, however not to exceed ten days. The failure to pay either expenses shall work a forfeiture of the right to do business.

"Section 12. Whenever it shall appear to the insurance commissioner that the assets of any investment company now or hereafter doing business in this state are impaired to the extent that such assets do not equal its liabilities, or that it is conducting its business in an unsafe, inequitable or unauthorized manner, or is jeopardizing the interest of its stockholders or investors in stock, bonds, or other securities by it offered for sale, or whenever any investment company shall fail or refuse to file any papers, statements or documents required by this act, without giving satisfactory reasons therefor, the insurance commissioner shall at once communicate such facts to the Attorney General, who shall thereupon apply to the chancery court where such company is located or is doing business, or to a judge of said court for the appointment of a receiver to take charge and if such facts or fact be made to appear it shall be sufficient evidence to authorize the appointment of a receiver and the making of such orders and decrees in such cases as equity may require.

"Section 13. Any person who shall knowingly or willfully subscribe to or make or cause to be made any false statements or false entry in any book of such investment company or exhibit any false paper with the intention of deceiving any person authorized to examine into the affairs of such investment company, or shall make or publish any false statement of the financial condition of such investment company, or the stocks, bonds or other securities by it offered for sale, shall be deemed guilty of a felony, and upon conviction thereof shall be fined not less than two hundred dollars ($200.00) nor more than ten thousand dollars, and shall be imprisoned for not less than one year nor more than ten years in the state penitentiary.

"Section 14. Any person or persons, agent or agents, who shall sell or attempt to sell the stock, bonds or other securities of any investment company, domestic or foreign, or the stock bonds or other securities by it offered for sale, who have not complied with the provisions of this act, or any investment company, domestic or foreign, which shall do any business, or offer or at-

tempt to do any business, except as provided in section 2 of this act, which shall not have complied with the provisions of this act, or any agent or agents who shall do or attempt to do any business for any investment company, domestic or foreign, in this state, which agent is not at the time duly registered and has fully complied with the provisions of this act, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined for each offense not less than one hundred dollars nor more than five thousand dollars, or by imprisonment in the county jail for not more than ninety days, or both such fine and imprisonment, at the discretion of the court.

"Section 15. All fees herein provided for shall be collected by the insurance commissioner and by him shall be turned over into the state treasury, and all fees so turned into the state treasury or so much thereof as may be necessary not to exceed five thousand dollars ($5,000) in any one year, are hereby reappropriated to the insurance commissioner for the purpose of paying the salaries and expenses necessary for carrying this act into effect; and the insurance commissioner is hereby authorized to appoint such clerk and deputies as are actually and absolutely necessary to carry this act into full force and effect. Provided, however, none of them shall be related by blood or marriage to such insurance commissioner or any of his deputies. All moneys actually and necessarily paid out by the insurance commissioner to any clerk or deputy appointed under this act, as salaries, or any money actually and necessarily paid out by the insurance commissioner, or by any clerk or deputy appointed under this act, for traveling or incidental expenses shall be paid by the state treasurer out of such fees upon the state auditor's warrants, to be issued upon sworn vouchers containing an itemized account of such salaries or expenses.

"Section 16. Should the courts declare any section of this act unconstitutional or unauthorized by law, or in conflict with any other section or provisions of this act, then such decision shall effect only the section or provision so declared to be unconstitutional, and shall not effect the other sections or part of this act.

"Section 17. In addition to the other penalties provided by this act, no contract made by any domestic or foreign investment company which has failed to secure a license as provided for in this act shall be enforceable in any of the courts of this state by said company.

"Section 18. Any individual, or persons, copartnership, corporation, companies or association, domestic or foreign which shall sell any building or investment contracts or like securities on which payments are required to be made by the purchaser from time to time, shall first before being permitted to do business in this state enter into a bond with the state of Arkansas in the sum of twenty thousand dollars ($20,000) for the faithful performance of its contract or undertaking. Said bond must be approved by the insurance commissioner and in all suits for a violation of contract or otherwise, the bonding company or securities may be joined in the original suit. Provided, that in lieu of the bond provided for in this section, such individual or persons, copartnership, corporations, companies or associations, domestic or foreign, may deposit twenty thousand dollars ($20,000) in cash, United States bonds, bonds of the state of Arkansas, if any such be issued or any municipality or improvement district in the state, or notes secured by first mortgages on real estate in Arkansas on which money has been loaned, provided the commissioner shall be the sole judge as to whether the bonds, secured notes or other securities are in fact worth twenty thousand dollars ($20,000) on the open market. Provided further, that any such individual or person, firm, company or corporation shall be entitled to collect the interest on any such bond certificates of deposit, mortgages, notes or other security so deposited, and shall also be entitled to affect an exchange of any such obligations so deposited by depositing in lieu thereof other security of equal value, or of the value of said sum of twenty thousand dollars ($20,000).

"Section 19. This act being necessary for the immediate preservation of the public peace, health and safety, shall take effect and be in force from and after its passage and all laws and parts of laws in conflict herewith are hereby repealed."

The allegations of the bill, in so far as they affect the questions involved herein, are: That the plaintiff is an investment company, organized and existing under and by virtue of the laws of the state of Delaware. That it is engaged in the business of writing and selling investment home purchasing contracts and in lending money on real estate collateral in the state of Arkansas and other states of the Union. That by the terms of these contracts the applicant therefor agrees to pay $6 at the time of signing the application therefor, and an additional $6 on the 15th day of each month thereafter until a loan has been made, when he pays an additional sum as interest, or until 80 monthly installments of $6 have been paid; it being further provided by the contract that in the event 80 monthly installments of $6 each have been paid for 80 consecutive months the company will refund to the purchaser the total monthly installments paid thereon and a pro rata share of the profits, which will amount to $240, and entitle the stockholder to $720, but the $720 is to be paid out of a certain fund if the money is in that fund. If the money is not in that fund and the party wants cash at maturity, he is to receive only $528, or a profit of $48 on the $480 paid. That by prompt payment of 12 installments the purchaser of the contract becomes eligible to receive a loan of funds to purchase a home, in the sum of $1,000, in the order of his application therefor, out of the loan or reserve fund of the number and series to which such contract may belong, the loan to be made when such funds have accumulated; but if there is a default in the monthly payments within the first 12 months all payments made are forfeited. To provide for this reserve fund the company agrees to place to the credit thereof $4.75 from each monthly installment received from the contract holder, after the third installment, together with return principal payments from loans granted from such fund, profits on loans, interest, and other items. The reserve fund is to be used only for loans to holders of contracts. After a loan has been made, the purchaser agrees to pay the same back to the company in small monthly installments, which payments are credited to the indebtedness and returned to the loan or reserve fund.

It is further alleged that plaintiff is offering these securities or contracts for sale in the state of Arkansas, and has been engaged in such business for a long time, and has expended large sums of money in advertising such business in order to build it up, and had invested large sums of money therein before the enactment of the act in question; that it has acquired in the course of such business a valuable good will and an extensive clientele, and valuable information as to the conduct of its business; that it has complied with all the laws of the state of Arkansas relative to foreign corporations, and has paid all fees required by law. It is further alleged that plaintiff sends into the state of Arkansas its agents and employés, who there solicit orders for the securities hereinbefore described, which orders are transmitted to the company at Birmingham, Ala., its principal place of business, where such orders are accepted or rejected, and if accepted the securities so purchased are then forwarded to the purchaser in Arkansas from the company's office in Birmingham, Ala.; that it has contracted to sell certain such securities, and is being solicited by various persons, firms, and corporations to sell the same, but is prohibited from so doing by the provisions of this act; that the defendants have notified plaintiff, and those with whom it has contracts upon which loans are ready to be made, that its securities cannot be sold in Arkansas, and that plaintiff cannot transact any business whatever in said state, because of the terms and provisions of said act.

In an amendment to the original bill it is alleged that plaintiff's business is transacted almost exclusively through the mails of the United States, the applications for securities and their acceptance being sent through the mail; that said business consists exclusively of interstate transactions. It is further alleged that plaintiff has filed with the bank commissioner all of the statements, papers, and information required by said act, but notwithstanding this the said commissioner arbitrarily refuses to give plaintiff the certificate of compliance provided by said act; that said defendants have announced their intention of arresting and prosecuting plaintiff, its solicitors, agents, and employés, and enforce the penalties provided by said act, should it attempt to further carry on its business in this state.

The bill attacks the constitutionality of the act upon the following grounds:

1. That it is in violation of the fourteenth amendment to the Constitution of the United States, because it denies complainant the equal protection of the law: (a) In that said act is applicable to state banks and trust companies, but not to national banks; (b) that it applies to stocks, bonds, and other securities, but is not applicable to the bonds of the United States, nor to any municipal bonds of the state of Arkansas; (c) that it applies to mortgage securities upon real estate situated without the state of Arkansas, but does not apply to mortgages on real property situated within the state of Arkansas; (d) that it does not apply to notes secured by mortgage upon real property situated within this state, but is applicable to mortgages on property within the state, if said mortgages secure bonds.

2. That said act is violative of section 8 of article 1 of the Constitution of the United States, because it imposes a burden upon interstate commerce, in that it prohibits the sale of stocks, bonds, and other securities of the plaintiff in the state of Arkansas unless said plaintiff and other companies of like nature, though organized under the laws of another state or country, shall have filed with the bank commissioner the report and information and paid the fees required by said act, and in all other respects conformed thereto; that the contracts and other securities issued by said investment company are legitimate articles of commerce, and that the sale thereof in interstate commerce is not subject to regulation by the state of Arkansas in any way whatsoever, and that the sale thereof by said investment company, its agents and brokers, to residents of the state of Arkansas, to be delivered in the state of Arkansas, payment therefor to be made upon such delivery and from time to time thereafter, to said investment company in another state, is interstate commerce, and the burden and restriction imposed upon such sale are burdens upon interstate commerce.

3. That said act is violative of the fourteenth amendment to the Constitution of the United States, because it deprives plaintiff of its property without due process of law and denies to it the freedom of contract guaranteed by the Constitution, in that: (a) It denies the right of any investment company, as defined in said act, to sell or dispose of its stocks, bonds, or any security, unless said investment company is solvent, irrespective of the price at which said security is to be sold, or the value thereof, and denies any person the right to purchase of any such investment company any of its stocks, bonds, or other securities, if said purchase will, in the opinion of said bank commissioner, probably result in loss to the purchaser, irrespective of the price at which said security is to be sold, and irrespective of the probability that such purchase may result in profit to said purchaser, even though such investment company sells the same without misrepresentation and after having truthfully set forth all facts in relation thereto to the purchaser thereof. (b) That the restrictions and conditions prescribed by the act are not within any power of the state of Arkansas to impose, and are not within the police power of said state, because said restrictions and conditions are not necessary to protect the health, safety, morals, and welfare of the people of the state of Arkansas; and since such restrictions and regulations are imposed upon the business of selling all securities of any kind, as described in said act, except those specifically exempted, they will seriously impede business and commerce of every kind whatsoever by preventing the free purchase of said securities, and the free investment in the stocks, bonds, and securities covered by the said act. (c) Because said act provides that the defendant bank commissioner, his clerks, accountants, and examiners, may examine the business of said investment companies, and their accounts, and may require them to divulge any and all facts in connection with said business, whether or not the same relates in any way to securities proposed to be sold in Arkansas. (d) That having entered the state of Arkansas before the passage of said act for the purpose of doing business therein, filed its charter or articles of association as required by the then existing laws, and paid its money to the state, it became entitled to transact its business therein so long as it continued to do so fairly, honestly, and free from just objection; that the state contracted with it that it should have this right; that under said act, if enforced, it is

not only unlawfully deprived of its property without any compensation whatever, but that the obligation of its contract with said state is impaired and destroyed, and is, therefore, in violation of the Constitution of the United States, prohibiting the passing of any law by any state impairing the obligation of contracts; that if said act is enforced it will be deprived of the benefit of previous transactions whereby it has sold many securities, made many contracts, and loaned out money in said state.

4. That said act is violative of section 11 of article 12 of the Constitution of the state of Arkansas, in that it places restrictions, regulations, and limitations on plaintiff's right to do business in this state which are not placed upon domestic corporations, the restrictions complained of being that while individuals, corporations, etc., residents of this state, may verify the statements required to be mailed before any officer of the state, and then sent by mail to the bank commissioner, nonresidents must verify them in the office of the bank commissioner and not elsewhere, thus requiring plaintiff and others similarly situated to make long journeys. and incur heavy expenses for the purpose of attesting the papers required to be filed by said act.

5. That said act is violative of the Constitution of the United States, in that the powers and duties conferred upon the said bank commissioner amount to a delegation of legislative power to him, because it empowers said commissioner to determine whether the proposed plan of business, or the proposed contract, of the said investment company is or is not "fair, just, and equitable," and likewise confers upon him the power to determine whether the purchase of said securities promises a "fair return thereon"; that the act in no respect determines the standard of what is or is not "fair," and in no respect determines the standard of what would be a "fair return" on said securities.

6. That said act is violative of section 9, article 2, of the Constitution of the state of Arkansas, because it subjects violators of the provisions of said act to excessive fines and cruel and unusual punishment, in that they are so severe as to prevent plaintiff from challenging the validity of said act in the courts, and necessarily constrain it to submit to the provisions thereof rather than take the chance of the penalties being imposed.

7. That the defendant bank commissioner has announced what facts and information in connection with said business he will require in its preliminary statement, on which the securities of such investment companies will or will not be permitted to be sold in the state of Arkansas, and has had advertised and published blank forms for the furnishing of information by said companies, which he requires all such companies to use in making application to do business in this state; that said blank requires that said investment companies furnish information which is unreasonable, not pertinent to the purpose for which said statement is required under the act, and substantially impossible to furnish for the following reasons: (a) Said blank requires a statement of the consideration paid for its stocks and bonds, whereas, to the unissued stocks and bonds of investment companies, no consideration has yet been paid. (b) It requires a true and complete list of the holders of the securities of said investment companies, wherever located, whereas such list is constantly changing and cannot be truly and completely made. Moreover, said list would require your orator and others similarly situated to furnish the said bank .commissioner names of its contract holders, or the holders of its securities, not only in the state of Arkansas, but in all other states and territories throughout the United States. (c) It requires a profit and loss statement which is not in conformity with the account upon its books, and which cannot be made in the manner required in the blank from the books of complainant and others similarly situated. (d) It requires a true and complete statement of its receipts and disbursements for the past 6 or 12 months, whereas such a statement would be cumbersome in the extreme, and would convey no information to said bank commissioner pertinent to the purposes expressed in said act. (e) It requires a list of the officers of said investment companies, together with their holdings of stocks and bonds, the actual cash invested, their estimated net worth, and the time devoted to the company, whereas the number of shares and bonds owned is a matter confidential to

217 F.—58

said officers, which said company has no right to divulge, nor has said company accurate information thereof, nor any way in which to determine the actual cash invested by said officers in said company, nor the estimated net worth of its said officers; that all such information is not pertinent to the purposes of said act and is beyond the power of defendants to require. (f) It requires certain references to the character, responsibility, and financial standing of each director, and of said investment company, whereas the giving of such references is not pertinent in any way to the purposes of said act, and is beyond the power of said defendants to require. (g) That said act requires that all such information obtained by said bank commissioner, and all the records of his office in regard thereto shall be open to examination by the public; that the information called for by said blanks is a valuable property right, the publication of which would deprive plaintiff of valuable property rights and would seriously damage its business and otherwise cause it damage and loss.

Murphy & McHaney, of Little Rock, Ark., for plaintiff.

Wm. L. Moose, Atty. Gen., and John P. Streepey, Asst. Atty. Gen., for defendants.

TRIEBER, District Judge (after stating the facts as above).  [1] It is a well-settled rule of law that a statute will not be declared unconstitutional at the instance of one not affected by it.  Williams v. Walsh, 222 U. S. 415, 423, 32 Sup. Ct. 137, 56 L. Ed. 253; Murphy v. California, 225 U. S. 623, 32 Sup. Ct. 697, 56 L. Ed. 1229, 41 L. R. A. (N. S.) 153; Rosenthal v. New York, 226 U. S. 260, 271, 33 Sup. Ct. 27, 57 L. Ed. 212, Ann. Cas. 1914B, 71; Missouri, K. & T. R. R. Co. v. Cade, 233 U. S. 642, 650, 34 Sup. Ct. 678, 58 L. Ed. 1135. Applying this rule, a number of the grounds upon which the plaintiff attacks the constitutionality of this act cannot be considered in this proceeding.

As the plaintiff is not engaged in the banking business, it cannot be affected by the fact that the statute is applicable to state banks and trust companies, and not to national banks, for, as stated in Collins v. Texas, 223 U. S. 288, 295, 32 Sup. Ct. 286, 56 L. Ed. 439:

"Where the party attacking the constitutionality of a statute has not suffered, the court will not speculate whether others may suffer."

Aside from this, the fact that national banks are excluded from the provisions of the act does not affect its validity for two reasons: First. National banks, being creatures of the national government, are not subject to control or regulations concerning the management of their business by the states. McClellan v. Chipman, 164 U. S. 347, 17 Sup. Ct. 85, 41 L. Ed. 461; Easton v. Iowa, 188 U. S. 220, 23 Sup. Ct. 288, 47 L. Ed. 452; Abilene Nat. Bank v. Dolley, 228 U. S. 1, 33 Sup. Ct. 409, 57 L. Ed. 707, affirming 179 Fed. 461, 102 C. C. A. 607, 32 L. R. A. (N. S.) 1065.  Second. The fact that some reasonable exceptions are made does not make the act unconstitutional.  As stated in Mutual Loan Co. v. Martell, 222 U. S. 225, 236, 32 Sup. Ct. 74, 76 (56 L. Ed. 175, Ann. Cas. 1913B, 529):

"Legislation may recognize degrees of evil without being arbitrarily unreasonable, or in conflict with the equal protection provision of the fourteenth amendment to the Constitution"—citing Ozan Lumber Co. v. Union Bank, 207

U. S. 251, 28 Sup. Ct. 89, 52 L. Ed. 195; Heath & M. Mfg. Co. v. Worst, 207 U. S. 338, 28 Sup. Ct. 114, 52 L. Ed. 236.

There are reasonable grounds for excepting national banks.

The same rule applies to the objection that, while the act applies to stocks, bonds, and other securities, it is not applicable to the bonds of the United States, nor to municipal bonds of the state of Arkansas. It is unnecessary to state reasons why this is not an unreasonable classification. They are apparent. Nor is it material, so far as the rights of the plaintiff are concerned, whether that provision of the statute which prohibits the sale of stocks, bonds, or other securities, unless the company issuing them is solvent, is constitutional or not, as the complainant specifically alleges that it is a solvent corporation and can therefore satisfy the bank commissioner of that fact.

That the act denies to persons the right to purchase stocks, bonds, or other securities of an investment company when, in the opinion of the bank commissioner, such purchase would result in a loss to purchasers, certainly cannot affect the plaintiff, who does not engage in the purchase of stocks or bonds, and does not claim to be authorized to do so by its charter.

Is the act violative of the commerce clause of the national Constitution because it imposes a burden upon interstate commerce? Unless the business of the plaintiff, as set out in its complaint, shows that it is engaged in interstate commerce, it is, for the reasons before stated, in no position to question the constitutionality of the act. The allegations in the bill, as set out in the statement of facts, show the complainant is not engaged in the sale of stocks, bonds, or other securities, as were the complainants in Alabama, etc., Transportation Co. v. Doyle (D. C.) 210 Fed. 173 (construing the Michigan "blue sky" statute), and in William R. Compton Co. v. Allen, 216 Fed. 537, decided by the District Court of the United States for the Southern District of Iowa (involving the Iowa statute). Therefore these cases are not applicable to the instant case.

[2] Is the plaintiff engaged in commerce? It offers nothing for sale, but is purely an investment company. It undertakes to invest any moneys intrusted to it, and the profits derived from the investment, after paying the expenses of the plaintiff corporation, are, after 80 monthly payments have been made, to be paid to the party who made these payments. But these profits are not to exceed a certain sum mentioned in the contract. This is no more commerce than insurance, and that insurance is not commerce, within the meaning of the commerce clause of the Constitution, is no longer an open question. The latest case on that subject is New York Life Insurance Co. v. Deer Lodge County, 231 U. S. 495, 34 Sup. Ct. 167, 58 L. Ed. 332, where the former decisions of the court, holding that insurance is not commerce, were reaffirmed. Nor are loans of money made to clients for the purpose of enabling them to acquire homes commerce, within the meaning of the commerce clause of the Constitution. Nelms v. Mortgage Co., 92 Ala. 157, 9 South. 141; Southern Bldg. & Loan Ass'n v. Norman, 98 Ky. 294, 32 S. W. 952, 31 L. R. A. 41, 56 Am. St. Rep. 367. Lending money is neither a sale nor a purchase.

Whether the provision of the act (section 4) which requires an officer of a foreign corporation to verify the statements necessary to obtain a license to do business in this state in the office of the bank commissioner, while the officers of a domestic corporation may verify them in any part of the state of Arkansas, and before any officer of that state authorized to administer oaths, and send them to the bank commissioner by mail, is such a discrimination as to vitiate the act, is also immaterial, so far as the plaintiff is concerned, as the complaint alleges that the verification was properly made in the manner prescribed by the statute. But, assuming that it would be unlawful, it would not affect any other provisions of the act, as it is clearly separable. Besides, section 16 of the act provides that:

"Should the courts declare any section of this act unconstitutional or unauthorized by law, or in conflict with any other section or provision of this act, then such decision shall affect only the section or provision so declared to be unconstitutional, and shall not affect the other sections or part of this act."

[3] The act is also attacked upon the ground that it authorizes the bank commissioner, his clerks, accountants, and examiners, to examine the business of such investment company, and may require it to divulge any and all facts in connection with said business, whether or not the same relates in any way to securities proposed to be sold in Arkansas. The plaintiff is a corporation, and it is now well settled by the decisions of the Supreme Court of the United States that the right to inquire into the condition of corporations exists, and, if necessary for the purpose of enforcing a law, to compel the production of all books, letters, and other records, without violating the provisions of the fourth and fifth amendments to the Constitution of the United States. Hale v. Henkel, 201 U. S. 43, 74, 75, 26 Sup. Ct. 370, 50 L. Ed. 652; Consolidated Rendering Co. v. Vermont, 207 U. S. 541, 28 Sup. Ct. 178, 52 L. Ed. 327, 12 Ann. Cas. 658; Hammond Packing Co. v. State of Arkansas, 212 U. S. 322, 348, 349, 29 Sup. Ct. 370, 53 L. Ed. 530, 15 Ann. Cas. 645; Wilson v. United States, 221 U. S. 361, 383, 31 Sup. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558.

[4] Does the fact that this corporation had, before the enactment of this statute, obtained a license to do business in the state of Arkansas, by complying with the laws then in force, and had entered into a large number of contracts in the state, prevent the state from changing the former laws or placing additional burdens upon corporations, foreign and domestic? Section 11 of article 12 of the Constitution of Arkansas, in force at the time the plaintiff first came into the state, provides that foreign corporations shall, as to contracts or business done in this state, "be subject to the same regulations, limitations and liabilities as like corporations of this state, and shall exercise no other or greater powers, privileges or franchises than may be exercised by like corporations of this state." Section 6 of the same article provides:

"The General Assembly shall have the power to alter, revoke or annul any charter of incorporation now existing and revocable at the adoption of this

Constitution, or any that may hereafter be created, whenever, in their opinion, it may be injurious to the citizens of this state, in such a manner, however, that no injustice shall be done to the corporators."

When a corporation accepts a charter in a state whose Constitution or general statutes contain such a provision, that provision becomes as much a part of the charter as if it were incorporated in it, and therefore authorizes the state to make any changes it sees proper, provided they do not amount to a confiscation of property or an impairment of the obligations of contracts. City of Owensboro v. Cumberland Tel. & Tel. Co., 230 U. S. 58, 33 Sup. Ct. 988, 57 L. Ed. 1389; Ozan Lumber Co. v. Biddie, 87 Ark. 587, 113 S. W. 796.

As to contracts made by and with the plaintiff prior to the time this act went into effect, it is sufficient to say that there is nothing in the act which prohibits the remittances of the monthly installments by its clients, as they become due, or prevents the plaintiff from carrying out its contracts entered into before this statute became effective. All this act undertakes to prohibit is the entering into contracts thereafter, unless the association complies with the provisions of the act. The statute is prospective and not retroactive.

[5] It is also claimed that the act is violative of the Constitution of the United States, in that the powers and duties conferred upon the bank commissioner amount to a delegation of legislative powers to him. That there is nothing in the Constitution of the United States which prohibits a state from conferring on a commission such powers as are conferred by this act has been frequently decided by the Supreme Court of the United States. United States v. Grimaud, 220 U S. 506, 517, 518, 31 Sup. Ct. 480, 55 L. Ed. 563; Red C. Oil Mfg. Co. v. North Carolina Board, 222 U. S. 380, 395, 32 Sup. Ct. 152, 56 L. Ed. 240. That it is not prohibited by the Constitution of the state of Arkansas has been determined by the Supreme Court of that state in Mechanics' Bldg. & Loan Ass'n v. Coffman, 110 Ark. 269, 162 S. W. 1090, involving this act.

That there is no foundation for the contention that the act is violative of those constitutional provisions of the United States and the state of Arkansas which prohibit excessive fines and cruel and unusual punishments requires no extended discussion. The punishment imposed by the act is not so excessive as to warrant a court in declaring it cruel, or even unusual. That is a matter for the legislative department of the government to determine. In order to enforce obedience to the law it is necessary to impose such punishment as will deter parties from violating it. The punishment of corporations is a fine of not less than $100 nor more than $5,000. Of course, there can be no imprisonment of a corporation; but even the imprisonment of individuals cannot exceed 90 days. In prosecutions for violations of this act the courts are given a great deal of latitude. A fine of $100 may deter a corporation with small capital, while it would not deter a corporation with millions of capital, from violating the law. The fact that many fines may be imposed for violations of the act, while an honest effort is being made to test the law, will

justify a court of equity to interpose its aid, by granting a temporary injunction while the validity of the act is being tested in the courts; but it will not justify a court to declare the entire act unconstitutional upon that ground, especially if we consider that the fine imposed under this act may be as low as $100.

The court is unable to find anything in the questions which applicants for permission to do business in the state are required to answer, which are inquisitorial to the extent of making them so unreasonable that the courts should set aside a statute, solemnly enacted by the legislative department of the state, except one. The exception referred to is the requirement of the bank commissioner of a true and complete list of the holders of all the securities of the company. It is no part of the statute, and is not authorized by the act. If plaintiff had been denied the right to do business in this state for its refusal to comply with this requirement of the commissioner, his action would no doubt be unwarranted, and in an action by the plaintiff under section 6 of the act could be corrected. But there is nothing in the complaint to show that this was the case, nor is this a proceeding under section 6.

The claim of plaintiff that the bank commissioner is vested with arbitrary power cannot be sustained, for section 6 of the act provides that:

"Whenever a right of any investment company to do business in this state is refused or revoked as set out in this section, said company may, within twenty days after notification institute a suit in the chancery court in any county in this state where its principal office is maintained or its principal agent resides, asking that said refusal or revocation be annulled. * * * If it be determined that the refusal or revocation was wrongful, the company shall be reinstated and the costs shall be paid in the same manner, and out of the same fund as the cost for maintaining this department."

There is, therefore, ample provision for preventing the bank commissioner from acting arbitrarily or unlawfully. Whether such a proceeding can be maintained in a court of the United States or only in the chancery courts of the state is immaterial in this case, for, as before stated, this is not a proceeding under that provision of the statute, but a direct proceeding to have the entire act, in so far as it affects the rights of this plaintiff, declared void as being in conflict with the Constitutions of the United States and the state of Arkansas.

[6] It is also claimed that the enforcement of the provisions of the act would amount to a deprivation of the right of freedom of contract. While freedom of contract is a right inherent in every person under the Constitution of the United States, and that of the state of Arkansas, it is not an absolute, but a qualified, right, free from arbitrary restraint, but subject to reasonable regulations. This subject has been so fully discussed in Chicago, B. & Q. R. R. Co. v. McGuire, 219 U. S. 549, 566, 567, 568, 31 Sup. Ct. 259, 55 L. Ed. 328, where the former rulings of that court are collated, that it is only necessary to refer to that case, which was reaffirmed since in Mutual Loan Co. v. Martell, 222 U. S. 225, 235, 32 Sup. Ct. 74, 56 L. Ed. 175, Ann. Cas. 1913B, 529, Rosenthal v. New York, 226 U. S. 260, 270, 33 Sup. Ct. 27, 57 L. Ed. 212,

Ann. Cas. 1914B, 71, and Erie R. R. Co. v. Williams, 233 U. S. 685, 699, 34 Sup. Ct. 761, 58 L. Ed. 1155.

[7] The courts cannot review the economics or facts on which the Legislature of a state bases its conclusions that an existing evil should be remedied by an exercise of the police power. Central Lumber Co. v. South Dakota, 226 U. S. 157, 33 Sup. Ct. 66, 57 L. Ed. 174. The requirements of the bank commissioner of a statement of the receipts and expenditures of the company, and a list of the officers of the company, with their holdings of stocks and bonds of the corporation, are not unreasonable. Experience has demonstrated the fact that some of the grossest frauds have been perpetrated on the public by investment companies by extravagant expenditures for salaries, agents' commissions, and other apparently legitimate purposes through officers who had practically nothing invested in the association, and whose character and reputation stamped them as adventurers and cheats. Such regulations are proper and wholesome. The dockets of the national courts have been crowded for the last few years with criminal prosecutions of persons charged with the use of the mails of the United States in carrying out fraudulent schemes by so-called investment companies and persons offering allurements to get rich quick. But those courts are only clothed with jurisdiction to prosecute those who, in carrying out their fraudulent schemes, make use of the mails, and then only after the commission of the offense. This necessarily affects only a small portion of those engaged in such schemes, and can in no wise act as a preventative. The states alone can provide for the prevention and punishment of all who commit frauds, although the mails are not used for their accomplishment, and enact laws to prevent the commission of these crimes. Legislation to prevent crime is of greater benefit to society than the punishment of the offender after the crime has been committed and innocent persons have been made to suffer. Statutes enacted for such purposes ought not to be declared invalid by the courts upon slight grounds, even if extreme cases can be imagined where they may work an injustice. The granting of the privilege to do business of that nature in the state by a high official is, to a certain extent, an assurance to the public that the corporation is properly managed. It is not only his privilege, but duty, to exercise great caution to satisfy himself that not only the scheme, but the men administering the affairs of the company, are of such character and standing, and have such a financial interest in the success of the scheme, as to give reasonable assurance to investors that their money will not be dishonestly dissipated or misappropriated. Nor can there be a reasonable objection to the provision of the statute that this information should be accessible to those who are inclined to invest their money in the securities of that association. There can be no better means of information than the sworn statements of the officers showing the condition of their corporation. National, as well as state, banks and insurance companies are required to publish similar information in the public press, and fully as much in their reports to the officials charged with their supervision. The validity of these requirements has never been questioned.

The claim that the provisions of the act are not within the police

power of the state, as they are not necessary to protect the health, safety, morals, and welfare of its people, cannot be sustained. Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487, and German Alliance Ins. Co. v. Kansas, 233 U. S. 389, 34 Sup. Ct. 612, 58 L. Ed. 1011, are the latest expressions of the Supreme Court on that subject, and leave nothing to be added.

That the statute makes exceptions in favor of notes secured by mortgages on real estate lying in the state of Arkansas cannot be said to be so unfounded and unreasonable as to authorize the court to declare it void. When the lands mortgaged are lying in the state, where the investor resides, he can more easily satisfy himself as to the validity of the title and the value of the mortgaged premises than if they are in a foreign state. The courts cannot pass upon the wisdom of legislation. As stated in Ozan Lumber Co. v. Union County Bank, 207 U. S. 251, 256, 28 Sup. Ct. 89, 91 (52 L. Ed. 195):

"It is almost impossible, in some matters, to foresee and provide for every imaginable and exceptional case, and a Legislature ought not to be required to do so at the risk of having its legislation declared void, although appropriate and proper upon the general subject upon which such legislation is to act, so long as there is no substantial and fair ground to say that the statute makes an unreasonable and unfounded general classification, and thereby denies to any person the equal protection of the laws. In a classification for governmental purposes there cannot be an *exact* exclusion or inclusion of persons and things."

The motion to dismiss the bill for failure to state a cause of action is sustained.