## THE MECHANICS BUILDING & LOAN ASSOCIATION

### v. COFFMAN.

Opinion delivered November 24, 1913.

1. STATUTES—PASSAGE—LEGALITY—EVIDENCE.—On the question whether an act was legally passed by the Legislature, a record entry of the legislative journal can not be contradicted by endorsements made on the original bill by an officer of either house; but the courts have the right to resort to any source of information filed in the office of the Secretary of State, in accordance with the statute, to arrive at a correct determination of what the journal shows. (Page 272.)

2. STATUTES—EVIDENCE OF EXISTENCE OF A LAW.—Where an act is in due form, properly signed and on file in the office of the Secretary of State, that is sufficient *prima facie* to advise the courts and citizens of the existence of such a law. (Page 273.)

3. STATUTES—REGULARITY OF PASSAGE—PRESUMPTION.—In order to overcome a *prima facie* presumption of regularity accompanying the passage of an enrolled bill so as to render it void, the showing by the legislative journals of a disregard of the constitutional requirements must be clear and convincing. (Page 274.)

4. STATUTES—PASSAGE—YEA AND NAY VOTE.—In concurring in amendments to bills, the Constitution does not require that it

shall be done by yea and nay vote, and that the same shall be entered upon the journal. (Page 275.)

5. LEGISLATIVE JOURNAL—OMISSION—AMENDMENT.—Where a Legislature has expired, its journal is beyond the power of amendment, and where the journal contains a clerical omission, there being no one legally authorized to make such amendment, the courts will supply all clerical mistakes in such records, to prevent the failure of a solemn legislative. enactment by mere clerical misprision. (Page 276.)

6. STATUTES—LEGALITY OF PASSAGE.—Act 214, Acts 1913, page 904, *held* to have been legally passed by the General Assembly. (Page 276.)

7. BUILDING AND LOAN ASSOCIATIONS—REGULATION BY THE STATE.—The business of building and loan associations, like the business of banking and insurance, is subject to regulation under the police power of the State. (Page 279.) ·

8. INVESTMENT COMPANIES—REGULATION BY STATE.—Act 214, Acts 1913, page 904, providing for the regulation and control of investment companies, and giving the Insurance Commissioner power to withhold from them the right to do business, but also giving the company the right to institute suit in the chancery court to annul the finding of the Insurance Commissioner, is not unconstitutional, and does ·not confer judicial power on the Insurance Commissioner. (Page 279.)

9. INVESTMENT COMPANIES—REGULATION BY STATE—CLASSIFICATION.— The Acts of 1913, page 904, Act 214, classifying investment companies for State regulation, *held* a proper and reasonable classification. (Page 279.)

10. STATUTES—REPEAL—BUILDING AND LOAN ASSOCIATIONS.—Act 307, Acts 1913, page 1249, providing for the assessment for taxation and the filing of individual statements by building and loan associations, does not repeal Act 214, Acts 1913, page 904, which regulates investment companies within the State. (Page 279.)

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

*Bradshaw, Rhoton & Helm,* for appellant.

1. The act was not passed by the Legislature, because that body failed to comply with the constitutional requirements, Constitution, art. 5, § 21; *Id.,* § 11; 33 Ark. 17; 77 Ark. 565; 22 L. R. A. (N. S.) 1089.

The notes of the stenographer of the house can not be used to impeach a bill by showing that action on it was indefinitely postponed. 29 Okla. 233.

In order to impeach an enrolled bill, the recitals of the legislative journals can not be contradicted or altered by memoranda made by legislative officers. 160 Ala. 181; 119 Ala. 484, 72 Am. St. Rep. 928; 20 Col. 1; 20 Fla. 407; 76 Atl. 370.

An enrolled bill may be impeached by the records of the Secretary of State by showing nonconcurrence of one house with an amendment contained in the enrolled bill where the journal does not show its contents. 72 Ark. 565.

The journal must show affirmatively that the bill passed. 36 Cyc. 957; 30 S. W. 426; 19 Ark. 250.

The requirement that each house shall keep a journal of its proceedings, means that the journal shall show all proceedings and all steps taken in the passage of every bill. 51 L. R. A. 396; 38 Id. 74-88; 9 Id. 404; 40 L. R. A. (N. S.) 7-38.

2. The act is unconstitutional because it gives arbitrary and unlimited power to the Insurance Commissioner. See sections 4, 5 and 6 of the act. Cooley's Const. Limitations, § 33; Const. Ark., art. 2, § 21; 8 Cyc. 866; 25 L. R. A. 621; 68 N. Y. Supp. 1067; 34 Pac. 461; Tiedeman, Limitations of Police Power, § 194.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. The court has the power and it is its duty to correct mere clerical errors appearing in legislative journals. 103 Ark. 109-113; 44 Ark. 536-549; 43 W. Va. 523-527; 2 Minn. 33, 36, 39; 26 Kan. 731; 41 Kan. 200-204.

2. Building and loan associations are included and come within the operations of the act. Acts 1913, p. 904; 218 U. S. 563; 219 U. S. 128.

3. The act is not unconstitutional by reason of the power it gives the Insurance Commissioner 148 Fed. 514-523; 131 Mich. 250; 136 S. W. 938.

HART, J. This is a proceeding instituted in the chancery court by the Mechanics Building & Loan Association against the Auditor of State to prevent him from requiring plaintiff to give the bond provided by section 18

of Act 214, approved March 24, 1913, as a prerequisite to doing business in the State of Arkansas. The chancellor sustained a demurrer to the complaint and, from the decree dismissing its bill for want of equity, the plaintiff has prosecuted an appeal to this court.

Counsel for plaintiff insist that the act in question was not passed by the Legislature because it did not conform to the constitutional requirements. Article 5, section 21, of our Constitution, provides, in substance, that on the final passage of all bills the votes shall be taken by yeas and nays and entered on the journal. Our court has held that this provision of the Constitution is mandatory, and that the failure to comply with it on the final passage of the bill by the Legislature, as a rule, renders the law void. *State* v. *Bowman*, 90 Ark. 174, and cases cited; *Butler* v. *Kavanaugh*, 103 Ark. 109. It has also held that where the journals affirmatively show that one branch of the Legislature did not concur in an amendment adopted by the other, an enrolled bill containing such amendment will be void. *Rogers* v. *State*, 72 Ark. 565.

Act 214 is contained in the session laws of 1913, page 904. In regard to the passage of the bill, the records of the Secretary of State show the following:

The bill was duly signed by the presiding officer of the Senate and of the House and attested by the secretary of each house. It was duly enrolled, approved by the Governor on March 24, 1913, and deposited in the office of the Secretary of State. The bill originated in the Senate and, after it was passed in that body, was transferred to the House. There, certain sections of the bill were amended, and the bill, as amended, passed the House. It was then returned to the Senate, and the subsequent action on the bill there is as follows: The Senate journal, containing the proceedings of February 24, 1913, shows the following:

"Senate Bill No. 3, was called up for the purpose of concurring in House amendments. The amendments were read twice and adopted. The bill as amended was

referred to the Engrossing Committee and made special order for Wednesday, 26th." On the back of the cover of the bill is endorsed, "S. O.—2-25—A. R. J. T. J. Terral, Secy."

The Senate Journal of the proceedings of February 25, 1913, shows the following:

"Senate Bill No. 3 was called up for the purpose of concurring in the House amendments. The secretary called the roll and the following voted in the affirmative (naming them, 30).

"Nays, none.

"Absent and not voting (naming the Senators, 6). So the amendments were concurred in."

Under this state of the record, it is the contention of counsel for plaintiff that the act, as it appears in the public acts of the General Assembly, was never passed, according to the Constitution, and, therefore, has not become a law. That is to say, they contend that the journal of the Senate shows that the bill, as amended by the House, never passed the Senate; but we can not agree with their contention. It is true that we have held that a record entry of the legislative journal can not be contradicted by endorsements made on the original bill by an officer of either house, but we have also held that we have the right to resort to any source of information filed in the office of the Secretary of State, in accordance with the statute, to arrive at a correct determination of what the journal shows. In the case of *Scott* v. *Clark County,* 34 Ark. 283, the court said:

"The act in question is on file in the office of the Secretary of State with the signatures, in due form, of the Speaker of the House, the President of the Senate, and the Governor of the State. This is sufficient *prima facie* to advise the courts of the existence of such a law, and to direct citizens and others in the regulation of their rights and conduct. When an act has actually received the intelligent assent of both houses of the General Assembly, been approved by the Governor, and published by authority, there should be shown a clear and palpable

disregard of constitutional directions in its passage, to induce the courts to hold it for naught. The public are not expected, in the transaction of ordinary business, to look behind the acts enrolled and signed; and it would lead to great wrong and inconvenience, as well as destroy all confidence in legislation, if the courts should be hypercritical in supervising the forms and proceedings of the lawmaking bodies, and setting aside their acts for slight causes.'' See also *Chicot County* v. *Davies,* 40 Ark. 200.

In the case last mentioned, the court re-affirmed the rule of our earlier cases that the enrolled bill is not conclusive, and said that it could be impeached by the legislative journal. It also held that where there is a variance between the manuscript and printed minutes of the legislative proceedings, the manuscript will prevail. In discussing the subject, the court said: ''To make all legislation ultimately depend on the fidelity with which a journal clerk has made his entries, is, in the expressive language of Judge Black, in Thompson's case, 9 Opinions of Attorneys General, 1, to render the laws as uncertain as the terms of a horse trade. We fear to turn loose a principle which might devour the whole statute book.''

The effect of this holding is that, in order to overcome a *prima facie* presumption of regularity accompanying an enrolled bill so as to render it void, the showing by the legislative journals in disregard of the constitutional requirements must be clear and convincing. It is the invariable practice in this State that bills shall be signed and attested respectively by the presiding officer and secretary of each body; that it shall then be enrolled under the direction of a committee of both houses appointed for that purpose. It is then transmitted to the Governor for his action and, when approved by him, is deposited in the office of the Secretary of State, together with all the records, books, papers and rolls of the General Assembly. In concurring in amendments, the Constitution does not require that it shall be done by yea and nay vote, and that the same shall be entered upon

the journal. *State* v *Corbett,* 61 Ark. 226. It has also been the general practice of legislative bodies in this State, when concurring in amendments, to do so by *viva voce* vote except when a division is called for, and then the members voting for or against the amendments. are counted and the result declared by the presiding officer of the body. As we have already seen, the Senate journal shows that the House amendments were concurred in on the 24th day of February, 1913, and that the bill was made a special order for the 26th inst. The Senate journal of the 25th inst. shows, when read literally, that the bill was called up, for the purpose of concurring in the House amendments, and that the roll was called, and the names of those voting in the affirmative and negative were duly recorded on the journal. After the date of the 25th of February, 1913, the journal does not show that any further action was taken in regard to the passage of the bill. So, when all these records that we have set out are read and considered together, it is plainly apparent that the record of February 25, 1913, showing that the House amendments were concurred in and that a yea and nay vote was taken, is a clerical misprision, and that the records show with reasonable certainty that the bill was read and finally passed on that day and that the yeas and nays were called and recorded in the journal. In discussing the principle involved in the case of *Price* v. *Moundsville,* 43 W. Va. 523, 64 Am. St. Rep. 878, the court said:

"The journal does not say that the bill was read a second time, but it is plainly apparent from what it does contain that this is a mere clerical omission, which, in a court of record, would be amendable on motion. The Legislature having expired, its journal is beyond the power of amendment, as there is no one legally authorized to make such amendment. The courts, therefore, will supply all clerical mistakes in such records, to prevent the failure of a solemn legislative enactment by mere clerical misprision. The Legislature having fully complied with the Constitution, its acts will not be vitiated

by a defect in the journal which is shown on the face thereof to be clerical in its nature; for in such case it does not affirmatively appear that the Legislature did not conform to the requirements of the Constitution, but the reverse is apparent, though not expressed in so many words. If a journal does not furnish the means of amendment on its face as to any essential matter that may be omitted, then the act would be vitiated. Such is not this case, for the second reading is apparent from the journal, though not expressed in words. *State* v. *Francis*, 26 Kan. 723.''

The plaintiff alleges that it was incorporated under the laws of this State for the purpose of conducting a business generally known as a ''building and loan association,'' and that it had been, and desired to continue, in said business in the city of Little Rock, in Pulaski County, Arkansas. That the plaintiff presented to the Auditor of State a statement showing in detail the plan upon which it proposed to transact business, and a statement of its financial condition, the amount of its property and liabilities, and in all other respects complied with Act 214 of the Acts of the General Assembly of 1913, except that it declined to comply with section 18 of the act, which required it to enter into bond with the State of Arkansas in the sum of twenty thousand dollars for the faithful performance of its contracts or undertakings, and that on account of its failure to give this bond, the Auditor of State refused to issue a permit to it to do business in this State. The object and purpose of this suit is to compel the Auditor and Insurance Commissioner to issue to plaintiff a permit to do business.

Counsel for plaintiff attack the constitutionality of Act No. 214, now under consideration. Section 6 of the act provides that the Insurance Commissioner shall examine the statements and documents filed, as provided by the act; that he shall make a detailed examination of the investment companies coming within the provisions of the act, at the expense of the company, and if he finds the company is solvent, that its constitution and by-laws

and proposed plan of business in the contract presented provide for a fair, just and equitable plan for the transaction of business and, in his judgment, promises a fair return on the stocks, bonds and other securities offered by it for sale, that he should issue a permit to do business. The section further provides that if said Insurance Commissioner finds that such articles of incorporation or association, charter, constitution and by-laws, plan of business or proposed contract contain any provision that is unfair and unjust and, in his judgment, does not promise a fair return on the stocks, bonds or other securities by it offered for sale, he shall refuse such company a permit to do business. The section also provides that whenever the right of any investment company to do business in this State is refused or revoked, as set out in the section, the company may, within twenty days after notification, institute a suit in the chancery court in any county in this State where its principal office is maintained or its principal agent resides, asking that said refusal or revocation be annulled. That if it be determined that the refusal or revocation was wrongful, the company shall be reinstated, and that the costs shall be paid in the same manner and out of the same fund as the cost for maintaining this department. Section 12 provides that when it shall appear to the Insurance Commissioner that the assets of any investment company doing business under the provisions of this act are impaired to the extent that such assets do not equal its liabilities, or that it is conducting its business in an unsafe or unauthorized manner, the Insurance Commissioner shall at once communicate such facts to the Attorney General, who shall immediately apply to the chancery court for the appointment of a receiver to take charge of the assets and affairs of said company. Section 1 of the act provides that "every individual corporation, co-partnership or company, and every association (other than national banks and corporations not organized for profit) . * * * shall be known as investment companies." In the case of *Brady* v. *Mattern,* 125 Ia. 158, 100 N. W. 358,

106 Am. St. Rep. 291, the court, in discussing the power of the Legislature to regulate the conduct of business of building and loan associations, said:

"It is hardly necessary to now enter into any discussion of the right and duty of the Legislature to regulate the various businesses conducted by banking, insurance, and building and loan associations. Such right and duty have been recognized by legislation in practically all of the States in the Union, and conceding as we must that such legislation is valid—that is, that these various forms of business may properly be regulated by the Legislature in the exercise of the police power—we reach the conclusion that it is within the power of a Legislature, if, in the exercise of its discretion, it sees fit to so enact, to limit such business to incorporated associations."

Neither may it be said that the statute is open to the objection that it improperly confers legislative power upon the Insurance Commissioner. In discussing a similar question, in the case of *Brady* v. *Mattern, supra,* the court said:

"We see no reason why the Legislature can not authorize the executive council to determine whether the plan and methods in accordance with which the building and loan business is to be conducted by any particular association are fair, reasonable, and in accordance with public policy, or why the State Auditor can not be authorized to fix the amount of securities which an unincorporated association desiring to conduct such business in the State shall deposit for the security of its members. It must be assumed that State officers will act fairly and impartially and in accordance with their best judgment, and statutory provisions allowing them to exercise a discretion in such action are not to be condemned as unconstitutional."

In the case of the *State, on the Relation of the Attorney General* v. *The Northwestern Trust Co.,* 101 N. W. 14, the Supreme Court of Nebraska, in discussing the provisions of a statute regulating banks, which was similar in all respects to the section of the statute now under

consideration, held that the statute did not confer judicial power on the State Banking Board.

In the case of *Noble State Bank* v. *Haskell,* 219 U. S. 104, the court held that the police power of the State extends to the regulation of the banking business, and even to its prohibition, except on such conditions as the State may prescribe.

In the case of *Camfield* v. *U. S.,* 167 U. S. 518, the court said that the police power is not subject to any definite limitations but is coextensive with the necessities of the case and the safeguarding of the public interest. See, also, *Bacon* v. *Walker,* 204 U. S. 311.

Thus it will be seen, the business of building and loan associations is subject to regulation under the police power of the State, as well as the business of banking and of insurance.

Our act provides that whenever any investment company is refused the right to do business in this State, it may institute a suit in the chancery court in any county in this State asking that said refusal be annulled, and that if it is determined that the refusal was wrongful, the company shall be reinstated. Our conclusion is that the statute under consideration is not unconstitutional as conferring judicial power on the Insurance Commissioner.

It is also settled by the authorities cited above that the classification made by the Legislature is not unreasonable and arbitrary, and we hold that the Legislature had the right to make the classification provided for in the act.

Act No. 307 of the General Assembly of 1913, page 1249, is an act to provide for the assessment for taxation and the filing of individual statements by the building and loan associations, and does not repeal the act under consideration, as contended by counsel for plaintiff. The latter act expressly recites that it is intended to govern the assessment of capital stock, shares of stock, and of other property of building and loan associations. Its provisions are not repugnant to the provisions of the

act under consideration, and the latter act does not repeal the former.

The decree will be affirmed.

McCulloch, C. J., and Smith, J., dissent from that part of the opinion which holds that the bill was passed in accordance with the mandates of the Constitution.

McCulloch, C. J., (dissenting). I am of the opinion that the statute involved in this controversy was not enacted in accordance with the mandatory provisions of the Constitution and, therefore, must record my dissent from the view of the majority in holding the statute valid.

The Constitution provides (article 5, section 21), that "No bill shall become a law unless on its final passage the vote be taken by yeas and nays, the names of the persons voting for and against the same be entered on the journal, and a majority of each house be recorded thereon as voting in its favor."

It will be observed from the language of this provision of the Constitution, that it not only requires the yeas and nays to be taken on final passage of a bill, but it makes the entry upon the journal the sole evidence thereof. The requirement that the vote be entered on the journal necessarily implies that the journal entries shall be the sole evidence, otherwise the requirement could not be treated as mandatory. That this provision is mandatory has been settled so far as a decision of this court can do so. *Smithee* v. *Garth,* 33 Ark. 17. In that case the court said:

"Manifestly the object of recording the *yeas* and *nays* is not to show that a quorum of the members of the house is present, or that a majority votes for the bill. The journal may show that there was a call of the house before the final vote on the passage of a bill was taken, and that a quorum was present, and indeed all the members present, and the journal may also state that a majority voted for the bill; yet if the *yeas* and *nays* be not entered on the journal, the requirement of the Constitution is not complied with, and the bill does not become a law."

It seems to me that if that be a correct statement of the purpose and effect of our constitutional provision, it necessarily follows that the journal entries can not be patched up or aided by evidence *aliunde* to show that the record entry related to the final passage of the bill instead of to the adoption of amendments. Unless the face of the journal shows that the vote was taken upon the final passage of the bill, this provision of the Constitution is not complied with and evidence of the fact can not be supplied *aliunde.* In other words, the journal, in order to comply with the constitutional requirement, must not only show the vote taken by yeas and nays, but it must show that that vote was upon the final passage of the bill.

In the case above cited the court quoted with approval from a decision of the Supreme Sourt of Alabama in *Walker* v. *Griffith,* 60 Ala. 361, where it was said:

"When the Constitution requires that a particular thing shall be necessary to the validity of an act of legislation, and that the journal must show that this thing was done—as, for instance, the passage of a bill by yeas and nays which shall be entered on the journals—unless they do show it, the act can not be accepted as constitutionally adopted. The thing thus required is an additional means, outside of the enrolled act, but in concurrence with the signatures of the Speaker of the House of Representatives and President of the Senate upon it, authenticating its passage through the two houses, and renders the forgery of such an act more difficult. And as the passage of it by the yeas and nays can not, according to the Constitution, be shown otherwise than by the journals, they must, in respect to it, 'import absolute verity.' The existence or non-existence of the statute depends on their testimony, whether they speak or are silent."

This court also referred with approval to an early case decided by the Supreme Court of Illinois (*Spangler* v. *Jacoby,* 14 Ill. 297), where it was said:

"The Constitution requires each house to keep a

journal, and declares that certain facts, made essential to the passage of a law, shall be stated therein.. If those facts are not set forth, the conclusion is that they did not transpire. The journal is made up under the immediate direction of the house, and is presumed to contain a full and complete history of its proceedings. If a certain act received the constitutional assent of the body, it will so appear on the face of its journal. And when a contest arises as to whether the act was thus passed, the journal may be appealed to to settle it. It is the evidence of the action of the house, and by it the act must stand or fall. * * * If the journal is lost or destroyed, this presumption will sustain the law, for it will be intended that the proper entry was made on the journal. But when the journal is in existence, and it fails to show that the act was passed in the mode prescribed by the Constitution, the presumption is overcome, and the act must fall."

Judge Cooley, in speaking of a provision of this sort, had this to say:

"It will not be presumed in any case, from the mere silence of the journals, that either house has exceeded its authority, or disregarded a constitutional requirement in the passage of legislative acts, unless where the Constitution has expressly required the journals to show the action taken, as for instance, where it requires the yeas and nays to be entered."

The same learned author, on another page of his work on this subject, said:

"It is also provided in the constitutions of some of the States that, on the final passage of every bill, the yeas and nays shall be entered on the journal. Such a provision is designed to serve an important purpose in compelling each member present to assume as well as to feel his due share of responsibility in legislation; and also in furnishing definite and conclusive evidence whether the bill has been passed by the requisite majority or not." Cooley's Constitutional Limitations (7 ed.), pp. 195 and 201.

This subject is thoroughly discussed in the opinion delivered by the Supreme Court of Delaware in the recent case of *Rash* v. *Allen,* 24 Del. 444, 76 Atl. 370, and it was there said:

"It can not be necessary to multiply authorities upon the point, that the court may, and should, take notice of the journals so far as to determine whether the Legislature, in the passage of an act, has done those things which the Constitution requires to be done, and also requires the journals to show. The Constitution, as to such matters, has made the journals the record evidence, and it must be the ultimate and conclusive evidence. Indeed, we do not know of any decision to the contrary, based on constitutional provisions like ours. * * * While some States have resorted to other sources of information than the journals when it was doubtful from the journals whether the act was constitutionally passed, it is otherwise when the fact in dispute is clearly established by the journals, and is required by the Constitution to be entered thereon. * * * But even though the original bills might be examined how could they show a compliance with the important, the essential constitutional requirement, towit: The entry of the yeas and nays on the journal? How could such compliance be shown except by the journals themselves? Would it be possible to show by other records or dockets that a certain entry was made in the journal when the journal is in existence and clearly shows that it was not so made? Suppose the clerk or Speaker had made some entry somewhere which stated that the yeas and nays were taken and entered on the journal, but the journal is present and contains no such entry? Could such outside entry possibly show a compliance with the constitutional requirement that the yeas and nays shall be entered on the journal? We think not."

The fact that the journal entry shows that a vote was taken on the adoption of amendments and fails to show one on the final passage of the bill, can not be explained as a mere clerical misprision and, for that reason, the entry treated as sufficient compliance with the Constitu-

tion. It is a mere matter of conjecture, so far as the record is concerned, whether the entry was erroneous, or whether the Senate erroneously voted the second time on the adoption of amendments. The very purpose of this constitutional provision is to provide evidence which leaves no doubt as to what was done, and unless that requirement is strictly complied with, its evidentiary force is entirely lost. It seems to me that the majority, by the conclusion they have reached in this case, are wearing away a plain and mandatory provision of the Constitution and that in bending it to meet the exigencies of this case, they have broken it.

Mr. Justice Smith authorizes me to say that he concurs in the views here expressed.