## STATE *v.* CROWE.

### Opinion delivered June 4, 1917.

1. STATUTES—VALIDITY OF ENACTMENT—AYE AND NAY VOTE.—The provision of the Constitution to the effect that "no bill shall become a law unless on its final passage the vote be taken by ayes and nays" does not apply to a vote of the House which originated the bill when concurring in amendments of the other house.

2. STATUTES—ENACTMENT—ERROR IN ENGROSSING.—A bill was passed by the House, and passed by the Senate with amendments; the House then concurred in the amendments. *Held,* a mistake made by a committee in the engrossment of the bill will not affect its validity, and may be corrected at any time before the bill is finally signed by the presiding officer and approved by the Governor as enrolled.

3. WORK AND LABOR—HOURS OF WORK AND MINIMUM WAGES FOR FE-
MALES.—The act of 1915, page 781, entitled "An Act to regulate
the hours of labor, safeguard the health and establish a minimum
wage for females in the State of Arkansas," *held* valid.

Appeal from Sebastian Circuit Court; *Paul Little,*
Judge; reversed.

*Wallace Davis,* Attorney General, *John P. Streepey,*
Assistant, and *Covington & Grant,* for appellant.

1. The act was legally passed. It was enrolled,
signed by the President of the Senate, the Speaker of the
House, approved by the Governor and filed with the Sec-
retary of State. 34 Ark. 283; 110 *Id.* 273.

2. The act does not violate section 2, article 2, Con-
stitution of Arkansas. 58 Ark. 414. It does not deprive
the employer of any constitutional right. Under the po-
lice power of the State, the act is valid. 58 Ark. 414; 94
U. S. 113; 143 *Id.* 517; 125 *Id.* 680; 49 Ark. 325; 3 Ala.
(N. S.) 140; 110 U. S. 347; 68 Ala. 58; 76 *Id.* 60; 200 U. S.
561; 204 *Id.* 311; 85 Ark. 464.

3. It does not violate the Fourteenth amendment to
the Constitution of the United States. 97 U. S. 501; 21
*Id.* 79; 85 Ark. 464; 139 Pac. 743; 208 U. S. 418; 223 *Id.* 59.

*Hill, Brizzolara & Fitzhugh,* for appellee.

1. The act was not legally adopted. The ayes and
noes were not recorded on the journal and the word
"mercantile" was not in the bill as finally passed by the
Senate. The two houses did not pass the same bill. 72
Ark. 565; 90 *Id.* 174; 29 So. 700; 50 Miss. 68; 1 Lewis'
Sutherland Stat. Const., § 52; Const., art. 6, § 15.

2. The act violates section 2, article 2, Constitution
of Arkansas, and the Fourteenth amendment to Constitu-
tion of United States. 191 U. S. 207; 198 *Id.* 45; 69 Wash.
578; 137 Pac. 469; 102 *Id.* 804; 142 N. Y. 102; 166 *Id.* 1; 5
Ohio N. P. 183; 167 Pa. St. 47; 160 Ind. 338. These "min-
imum wages" statutes as applied to *private* employment
violate constitutional provisions. Cases *supra;* 139 Pac.
473; 208 U. S. 418.

3. Women are citizens and have power to contract. The statute infringes their rights. 165 U. S. 578; 208 *Id.* 161; 58 Pac. 1072; 155 Ill. 886; 115 Mo. 1; 239 *Id.* 352; 111 U. S. 757; 233 U. S. 630; 236 *Id.* 1.

4. The act can not be justified even under the *police power* of the State. This power does not reach to the wage scale. 123 U. S. 623; 152 *Id.* 137; 198 *Id.* 57; 113 Pa. St. 431.

5. The act unconstitutionally discriminates against individuals employing fcur or more women. 154 Mo. 375; 183 U. S. 79; 61 Kan. 174.

6. The State has no power to enact labor or wage laws as to *private* employment. 2 Labatt on Master & Servant, § 846; Cooley, Const. Laws (7 ed.) 870; Tiedeman, Lim. Police Power, § 178; Freund on Police Power, § 318; 6 R. C. L. 270-1. The Arkansas cases recognize the right of parties engaged in private enterprises to make such contracts as they deem necessary free from State interference. 58 Ark. 407, 436. The act is obnoxious to our form of government. 208 U. S., *Muller* v. *Ogden.*

*Wallace Davis, Jno. P. Streepey* and *Covington & Grant,* in reply, for appellant.

1. No yea and nay vote was required to concur in an amendment. 110 Ark. 269; 61 *Id.* 226. The omission of the word "mercantile" was a mere oversight and was properly inserted. The bill, as it now appears in the office of the Secretary of State, establishes *prima facie* that it was legally passed. 72 Ark. 567; 40 *Id.* 200; 90 *Id.* 174; 95 *Id.* 412; 44 *Id.* 536; 110 *Id.* 269.

2. The act is not unconstitutional. It is a valid exercise of the police power of the State. 208 U. S. 412; 120 Mass. 383; 65 Neb. 394; 29 Wash. 602; 97 N. E. 194; 131 Pac. 452; 163 Mich. 419; 139 Pac. 743; 141 *Id.* 158.

3. There is no discrimination, as the act only applies to classes. 86 Ark. 412; 219 U. S. 291; 183 *Id.* 79; 49 Ark. 325; 81 *Id.* 310; 125 U. S. 680; 69 Ark. 521; 86 *Id.* 428; 32 L. R. A. 857. See also 197 U. S. 11.

HART, J. There is drawn in controversy in this case the validity of Act No. 191 of the General Assembly of 1915 (page 781) entitled, "An Act to regulate the hours of labor, safeguard the health and establish a minimum wage for females in the State of Arkansas."

The controversy arises only as to the validity of that part of the statute which relates to the fixing of minimum wages. It is contended, in the first place, that the statute was not legally enacted in that when the final vote was taken in the Senate the ayes and nays were not recorded on the journal, as required by section 21, article 5, of the Constitution.

The first section of the statute, as appears from the enrolled bill, signed by the presiding officer of each house and the Governor, specifies, among the employers of female labor to be regulated "any manufacturing, mechanical or mercantile establishment." Section 7 refers to employers specified in section 1, and prescribes a minimum wage of female workers in the establishments mentioned.

The bill as originally introduced in the Senate contained the language quoted above, which was never changed in the passage of the bill through the two houses, although there were numerous amendments. The Senate passed the bill on February 25, 1915, and transmitted it to the House, where several amendments were adopted, and the House passed the bill as amended on March 10, 1915, and sent it back to the Senate. On receipt of the bill the Senate, according to the recitals of the journal, read each amendment twice and concurred in the same, and ordered the bill engrossed as amended, and made a special order for the next day. None of the votes by which amendments were concurred in were taken by the ayes and nays recorded on the journal, but on the next day (March 11, 1915) a vote by ayes and nays was taken on the engrossed bill and the names of those voting were spread upon the journal, it appearing therefrom that a large majority voted in the affirmative. In the engrossment of the bill the word "mercantile" was omitted, and

that word was not contained in the engrossed copy which was before the Senate when the vote by ayes and nays was taken. It is clear that the omission of the word was merely an inadvertence, for, as before stated, the bill had never been changed so far as concerns the use of that word. The bill was enrolled with the word "mercantile" in it, and in that form was duly signed by the presiding officers of the two houses and the Governor.

(1) The contention of those attacking the validity of the statute is that a final vote on the passage of the bill in the Senate after the concurrence in the amendments was necessary to the enactment of the statute, and that since the word "mercantile" was omitted from the copy which the Senate finally voted on, it was not the bill which had been passed by the house. This contention, we think, is unsound. The word "mercantile" was in the bill when the Senate concurred in the House amendments and the vote concurring in those amendments completed the passage of the bill. The provision of the Constitution to the effect that "no bill shall become a law unless on its final passage the vote be taken by yeas and nays" does not apply to a vote of the house which originated the bill when concurring in amendments of the other house. *State v. Corbett,* 61 Ark. 227; *The Mechanics Building & Loan Association v. Coffman,* 110 Ark. 269; *Hull v. Miller,* 4 Neb. 503; *McCulloch v. State,* 11 Ind. 424.

The case of *Hull v. Miller, supra,* was referred to with approval by this court in the Corbett case, and it is identical in this respect with the case now before us, and was decided under a similar provision in the State Constitution. The only difference in the cases is that in the Nebraska case the journal of the Senate (the bill having originated in the Senate) showed nothing further after the return of the bill from the House except that the amendments of the House to the bill were adopted showing by what majority or in what manner the vote was taken. The Supreme Court of Nebraska held that that was sufficient, and that the bill had been legally passed, notwithstanding the fact that the concurrence of the Senate in

the House amendments had not been obtained by a yea and nay vote.

(2)　It was proper and orderly for the amendments concurred in to be formally incorporated in the bill by engrossment under the supervision of the committee of the Senate and in accordance with the rules, but the additional vote thereafter was supererogatory, for the simple reason that the concurrence in the amendments completed the passage of the bill. A mistake made by the committee in the engrossment of the bill did not affect its validity and could be corrected at any time before the bill was finally signed by the presiding officer and approved by the Governor as enrolled.

The conclusion reached by the court is that the statute was duly enacted and that no constitutional requirement was omitted during its passage through the two Houses.

This case was submitted in October, 1915. We were advised that a similar statute enacted by the Legislature of the State of Oregon and upheld by the Supreme Court of that State, *Stettler* v. *O'Hara,* reported in 139 Pac. 743, Ann. Cas. 1916, A-217, was then under consideration on writ of error by the Supreme Court of the United States. We decided to await the decision of that court in that case. It has only been recently decided and the decision of the Supreme Court of Oregon was affirmed without a written opinion of the court because one member of the court was disqualified and the others were evenly divided on the question.

(3)　The constitutionality of the statute is attacked on the ground that the act violates the Fourteenth amendment of the Constitution of the United States by interfering with the right of contract of both employer and employee. As early as 1876, the Supreme Court of the State of Massachusetts upheld the validity of a law prohibiting the employment of minors under the age of eighteen years and women in manufacturing establishments more than a certain number of hours per day or week. There, as here, the validity of the act was attacked on the ground that it

interfered with the liberty of contract of both employer and employee. *Commonwealth* v. *Hamilton Manufacturing Co.,* 120 Mass. 383. Since then statutes regulating and limiting the hours of labor of women and discriminating in their favor in that regard have been passed in twenty-seven States and have been generally sustained by the State courts of last resort and by the Supreme Court of the United States. *Ritchie & Co.* v. *Wayman,* 244 Ill. 509, 91 N. E. 695, 27 L. R. A. (N. S.) 994; *People* v. *Elerding,* 254 Ill. 579, 98 N. E. 982, 40 L. R. A. (N. S.) 893; *Muller* v. *Oregon,* 208 U. S. 412; *Withey* v. *Bloem,* 163 Mich. 419, 128 N. W. 913, and case note. In that case reference to the earlier case notes on the question are made. *Ex parte Wong Wing* (Cal.), 51 L. R. A. (N. S.) 361, and note; *State* v. *Bunting,* 71 Ore. 259, 139 Pac. 731, Ann. Cas. 1916 C-1003 and case note, in which earlier case notes are referred to. Among them is the case of *Riley* v. *Commonwealth of Massachusetts,* 232 U. S. 671, in which the Supreme Court of the United States affirmed a decision of the Supreme Court of the State of Massachusetts to the effect that a State statute limiting the hours of labor in factories for women, if otherwise valid, is not unconstitutional as depriving the employer and the employee of property without due process of law by limiting the right to buy and sell labor and infringing the liberty of contract in that respect.

In *People* v. *Charles Schweinder Press,* 214 N. Y. 395, 108 N. E. 639, Ann. Cas. 1916, D-1059, the New York Court of Appeals upheld a statute prohibiting women from working at night in factories and held that the statute was constitutional as a police regulation in the interest of public health and the general welfare of the people. The court said: "Protection of the health of women is a subject of special concern to the State. However confident a great number of people may be that in many spheres of activity, including that of the administration of government, woman is the full equal of man, no one doubts that as regards bodily strength and endurance she is inferior and that her health in the field of physical

labor must be specially guarded by the State if it is to be preserved, and if she is to continue successfully and healthfully to discharge the duties which nature has imposed upon her. This proposition is fully recognized and stated in *Muller* v. *Oregon,* 208 U. S. 412, 421, 28 S. Ct. 324, 52 U. S. (L. ed.) 551, 13 Ann. Cas. 957, where it was said: "That woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence is obvious. This is especially true when the burdens of motherhood are upon her. Even when they are not, by abundant testimony of the medical fraternity continuance for a long time on her feet at work, repeating this from day to day, tends to injurious effects upon the body, and as healthy mothers are essential to vigorous offspring, the physical well-being of women becomes an object of public interest and care in order to preserve the strength and vigor of the race. * * * Differentiated by these matters from the other sex, she is properly placed in a class by herself, and legislation designed for her protction may be sustained, even when like legislation is not necessary for men and could not be sustained." In *People* v. *Case,* 153 Mich. 98, 116 N W. 558, 18 L. R. A. (N. S.) 657, it was held that a municipal ordinance prohibiting keepers of saloons where intoxicating liquors are sold from permitting women to be in or about their places of business and from selling intoxicants to them is not an unconstitutional discrimination against women, nor does it deprive them of their equal rights, privileges and immunities under the Constitution.

In the case note it was recognized that the power to exclude women from saloons or employment therein is but one phase of the broader question of the constitutionality of discrimination against women in police regulations and it was said that the constitutionality of the statutes excluding women from employment in saloons or other places where intoxicating liquors are sold has been almost universally sustained. Judge Cooley says:

"Some employments * * * may be admissible for males and improper for females, and regulations recog-

nizing the impropriety and forbidding women engaging in them would be open to no reasonable objection.'' Cooley on Constitutional Limitation (7 ed.), p. 889. (Note—See 50 Am. Rep. 636, for page and edition.)

Statutes similar to the one under consideration have been enacted in at least nine other States. It is true that it has been often held by the Supreme Court of the United States that the general right to contract is protected by the Fourteenth Amendment to the Constitution; yet is equally well settled that that this liberty is not absolute, but that a State may in the exercise of its police power prevent the individual from making certain kinds of contracts. In *Williams* v. *State,* 85 Ark. 464, this court, admitting that the police power of the State is incapable of precise definition after quoting from two decisions of the Supreme Court of the United States on the question, said: ''These cases are cited to show that the exercise of the police power is not limited to regulations to promote the public health, morals or safety, and that it may be so extended to such regulations as will promote the public convenience and general prosperity.'' In *Chicago* v. *Bowman Dairy Co.,* 234 Ill. 294, 14 A. & E. Ann. Cas. 700, 17 L. R. A. (N. S.) 684, it was said: ''The police power is said to be an attribute of sovereignty, and to exist without any reservation in the Constitution, and to be founded upon the duty of the State to protect its citizens and to provide the safety and good order of society.''

In *Otis* v. *Parker,* 187 U. S. 606, Mr. Justice Holmes said: ''While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a Constitution, instead of embodying only relatively fundamental rules of right, as generally understood by all English speaking communities, would become the partisan of a particular set of

ethical or economical opinions which by no means are held *semper ubique et ab omnibus.''*

It is a matter of common knowledge of which we take judicial notice that conditions have arisen with reference to the employment of women which has made it necessary for many of the States to appoint commissions to make a detailed investigation of the subject of women's work and their wages. Many voluntary societies have made this question the subject of careful investigation. Medical societies and scientists have studied the subject and have collected carefully prepared data upon which they have prepared written opinions. It has been the concensus of opinion of all these societies, medical and other scientific experts that inadequate wages tend to impair the health of women in all cases and in some cases to injuriously affect their morals. Indeed, it is a matter of common knowledge that if women are paid inadequate wages so that they are not able to purchase sufficient food to properly nourish their bodies, this will as certainly impair their health as overwork. It is certain that if their wages are not sufficient to purchase proper nourishment for their bodies, the deficiency must be supplied by some one else or by the public, if they are to keep their normal strength and health. The investigations above referred to show that it has become absolutely necessary for many women to work to sustain themselves and that they have no one to assist them. The strength, intelligence and virtue of each generation depends to a great extent upon the mothers. Therefore, the health and morals of the women are a matter of grave concern to the public and consequently to the State itself.

The members of the Legislature come from every county in the State. The presumption is that it passed the statute to meet a condition which it found to exist and to remedy the evil caused thereby. On this question, Judge Cooley says:

''Whether a statute is constitutional or not is always a question of power; that is, a question whether the Legislature in the particular case, in respect to the subject

matter of the act, the manner in which its object is to be accomplished and the mode of enacting it has kept within the constitutional limits and observed the constitutional conditions. In any case, in which this question is answered in the affirmative the courts are not at liberty to inquire into the proper exercise of the power. They must assume that legislative discretion has been properly exercised. Cooley, Const. Lim. (7 ed.), p. 257.

As said in *Stettler* v. *O'Hara, supra,* we believe that every argument put forward to sustain the maximum hours law or the restriction of places where women work applies equally in favor of the minimum wage law as also being within the police power of the State and as a regulation tending to guard the public morals and the public health.

Of course, the Legislature could not fix an unreasonable or arbitrary minimum wage but it must be fair and reasonable. It has been said that as to what is fair and reasonable there is no standard more appropriate than ''the normal needs of the average employee, regarded as a human being living in a civilized community.''

It follows that the judgment must be reversed and the cause remanded for further proceedings according to law.

McCULLOCH, C. J., (dissenting). The majority seem to rest their conclusions, in sustaining the validity of the Women's Minimum Wage Statute, upon the authority of two classes of cases, one class holding minimum hours of labor laws to be valid, and the other holding that a statute forbidding the employment of women in saloons constitutes a proper exercise of the police power. There can scarcely remain a doubt as to the correctness of those cases—at least none exists in my mind.

Society is interested in the protection of the health of women, and laws regulating their hours of labor and the kind of labor in which they may engage, are valid because such regulations tend to the protection of health, not only of the women whose habits of labor are regulated, but the whole of humanity. The same may be said

of child labor laws. The hours of labor of men in extra hazardous or arduous employments may be regulated by law because society at large is interested in the preservation of men's safety and health.

Laws prohibiting the employment of women in or about drinking saloons are valid for such obvious reasons that no discussion is necessary.

To these classes of legislation in the exercise of the police power may be added another class which regulates not only the hours of labor, but also the wages of persons engaged in public or *quasi*-public service, and such laws are generally held to be valid exercises of power. Consideration for the efficiency of the public service justify such laws and bring them within the rule that the sovereign power of the State may be called into action for the promotion of the public health, morals or safety, and even of the public convenience. They are justified, not because they especially benefit a class of individuals, but in spite of it, if the interests of the public call for the given regulation.

"To justify the State in thus imposing its authority in behalf of the public," said the Supreme Court of the United States in *Lawton* v. *Steele,* 152 U. S. 137, "it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose and not unduly oppressive upon individuals."

The statute now under consideration does not, in my opinion, stand the test prescribed by the highest court in this country in the above quotation. Nor do the authorities cited in the opinion of the majority sustain it.

Statutes prescribing hours of labor for either women or men are valid, when reasonable, but it is quite a different thing to say that the lawmakers may invade the right of contract by fixing wages for men or women engaged in private service. There is no basis for such governmental interference. The Supreme Court of the United States said:

"If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Mugler* v. *Kansas*, 123 U. S. 623. And the same learned court in a recent case used the following language very pertinent to the question now under discussion:

"The right of a person to sell his labor upon such terms as he sees proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it." *Coppage* v. *Kansas*, 236 U. S. 1.

Mr. Freund, in his work on Police Power (section 318), says: "The power to regulate the rate of wages, while freely exercised in former times, has not been claimed by any American State. * * * In principle it would make no difference whether the rate fixed by law were intended to be a minimum or maximum rate. Consideration of health and safety which complicate the question of hours of labor do not enter into the question of rate. The regulation would be purely of an economic character. It would be closely analogous to the regulation of the price of other commodities or services."

I challenge the correctness of the assertion that there exists a discernible relation between the wages of women and their health or morals. It may be truly said in a larger sense that the contentment which financial ease sometimes brings is conducive to health and morality, but, if so, that effect is not confined to either of the sexes.

It is almost axiomatic that society would be better off if everybody received greater remuneration and in more equal proportion—in other words, if there were no poor—and the attainment of that ideal is the hope of those who search for ways for the improvement of social conditions. To that end men willingly impose governmental restraint upon themselves. But unless the American conception of legal regulation of personal liberty has

changed, and accepted theories of constitutional government are to be abandoned, it will scarcely be urged that the price of labor generally can or should be regulated by law. The right to sell or buy labor on his own terms is among the things that the individual has not, under our scheme, surrendered to government. And women possess that right to the same unrestricted extent as men. They stand, in that respect, in no class to themselves.

Wealth, at least to the extent that it affords ease and comfort, is the goal of all mankind, regardless of sex, and failure of its attainment often brings discontent and unhappiness, but I am unwilling to say that woman's health or virtue is dependent upon financial circumstances so as to justify the State in attempting to regulate her wages. Her virtue is without price, in gold. She may become the victim of her misplaced affections and yield her virtue, but sell it for money—no. When she falls so low as that it is only from the isolated helplessness of her shame and degradation.

Nor is the health of women, as a class, affected more by poverty, if at all, than that of men. If it is, then men who are charged with the duty of supporting wives and daughters should have their wages regulated by law too when we enter upon the exercise of that governmental function. If affluence is essential to the health of women and we determine to bring it about by legal regulation of wages, then there should be no distinction made between the wages of the women themselves, and of the men who are called on to support them. I maintain that neither the one nor the other is a proper subject for governmental interference, but that the ills and inconvenience of poverty to which all mankind, without distinction of class, is heir, must be corrected by other means and through other influences and channels. There are ills which will never be entirely eliminated, for they are among the human imperfections which will survive to some extent as long as earthly time lasts.

The Supreme Court of the United States has repeatedly held that the unrestricted right of an individual to

sell or buy labor, unless there are circumstances which involve the public interest, is a part of the liberty of the citizen protected by the Federal Constitution. *Butchers Union, etc., Co.* v. *Crescent City Co.,* 111 U. S. 746; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Adair* v. *U. S.,* 208 U. S. 161; *Smith* v. *Texas,* 233 U. S. 630; *Coppage* v. *Kansas, supra.*

Until that court, in a decision which constitutes a precedent, changes that rule, or holds that minimum wage laws do not fall within it, I am not disposed to yield my deliberately formed convictions on the subject and uphold a statute which it seems to me is a clear invasion of personal liberty of action.

The case of *Stettler* v. *O'Hara,* which went up to the Supreme Court of the United States was decided by an equally divided court and without a written opinion. Under the practice of that court, as I understand it, such a decision does not become a precedent and it is without persuasive force. We should not assume that, merely because the nonparticipating justice who otherwise would have broken the tie had been of counsel in the case on the side which sought to uphold the validity of the statute, when the same question is again presented the decision will be the same as that which resulted from the accident of an equally divided court. We can not foresee when nor how nor under what circumstances the question will again come before that court for decision and the State courts are under no obligation to consider the decision as a precedent until that court so treats it.

I have discussed only such questions concerning the validity of the statute as are presented in the briefs of counsel and discussed in the majority opinion, and I express no opinion on other questions which a further analysis of the statute might suggest.

WOOD, J. I concur in the reasoning of the opinion by the Chief Justice. The statute clearly invades the Constitution of the United States and of our own State, but the decision of the Supreme Court of the United States construing a similar statute is controlling on the issue be-

fore us. The litigants are entitled to the benefits of the law as declared by that court on the subject until it holds otherwise. Therefore I concur in the judgment.